**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **RICARDO M. TAPIA,** | ) | |
| | ) | **No. 15 C 04546** |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | |
| | ) | **Magistrate Judge Susan E. Cox** |
| **CAROLYN W. COLVIN, Acting** | ) | |
| **Commissioner of the U.S. Social** | ) | |
| **Security Administration,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## ORDER

Plaintiff Ricardo Tapia ("Plaintiff") appeals the decision of the Commissioner of the Social Security Administration ("SSA") denying his Social Security Disability Insurance Benefits under Title II ("DIB") and Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("the Act"). Plaintiff has filed a motion for summary judgment [14] and the Commissioner has filed a cross-motion for summary judgment [22]. After reviewing the record, the court grants Plaintiff's motion for summary judgment and denies the Commissioner's motion for summary judgment. The case is remanded to the agency for further proceedings consistent with this opinion.

## BACKGROUND

**I.     Procedural History**

Plaintiff filed concurrent DIB and SSI applications on April 7, 2010 alleging a disability onset date of January 1, 2009 due to depression, post-traumatic stress disorder ("PTSD") and other mental conditions.[1] His initial application was denied on July 21, 2010 and again at the

---

[1] (R476-85, 529)

reconsideration stage on December 9, 2010.[2] Plaintiff requested a hearing before an Administrative Law Judge ("ALJ") on February 7, 2011 and the hearing was scheduled on January 18, 2012.[3] Plaintiff appeared at the hearing with his attorney.[4] A Vocational Expert ("VE") was also present and offered testimony.[5] On January 26, 2012, the ALJ issued a written decision denying Plaintiff's application for DIB and SSI benefits.[6] The Appeals Council ("AC") granted review on March 14, 2013 and remanded the case to the ALJ because the Medical Expert ("ME") opinion was not based on the whole record, the weight assigned to the opinion evidence was unclear, and because the ALJ needed to further evaluate Plaintiff's past relevant work.[7] Another hearing was scheduled on October 17, 2013 in which Plaintiff appeared along with his attorney and testified before the same ALJ.[8] On December 6, 2013, the ALJ issued a written decision once again denying Plaintiff's DIB and SSI applications.[9] The AC denied review on March 25, 2015, thus rendering the ALJ's decision as the final decision of the Commissioner.[10]

## II.    Medical Evidence

### A.    Treating Source

On December 1, 2009, Plaintiff was admitted to Sherman Hospital due to suicidal ideations while in police custody.[11] While at the hospital, he told the attending physicians that he had been taking medication for his depression but that the police threw it away while he was

---

[2] (R190-93)
[3] (R107-89, 235-36)
[4] (Id.)
[5] (Id.)
[6] (R194-206)
[7] (R213-16)
[8] (R42-106)
[9] (R11-27)
[10] (R1-5); *Herron v. Shalala*, 19 F.3d 329, 332 (7th Cir. 1994)
[11] (R757)

2

detained.[12] After an initial evaluation, Plaintiff was transferred to the VA Hospital in Hines for further evaluation.[13]

Medical records indicate that Plaintiff has been a patient at the VA Hospital in Hines since September 2009.[14] He has been treated for depression, PTSD, major marijuana abuse, poor coping skills, anger management, and alcohol abuse.[15] He also met with counselors of the VA Hospital to discuss his issues obtaining housing, as he is either homeless or living with friends.[16] Apart from mental impairments, Plaintiff sought help for his lower back pain which he alleges he has had since his service abroad.[17] Plaintiff stated that walking, standing, or lifting heavy objects for long periods of time exacerbates the condition.[18] A physical examination returned normal results and Plaintiff was noted to have normal gait and 5/5 bilateral upper and lower extremity strength.[19] He was advised to apply ice to affected area, take ibuprofen for the pain, and exercise as tolerated.[20]

On October 5, 2009, Plaintiff returned to the VA Hospital for treatment for his anxiety which was triggered by his homelessness and issues with his girlfriend.[21] He was prescribed Prozac.[22] After his referral from Sherman Hospital on December 1, 2009, Plaintiff was hospitalized at the VA Hospital through December 4, 2009. During his stay, it was noted that he slept well without depressive or anxiety symptoms.[23] A mental status exam was conducted and

---

[12] (Id.)
[13] (R771)
[14] (R874)
[15] (Id.)
[16] (R894)
[17] (R857)
[18] (Id.)
[19] (Id.)
[20] (Id.)
[21] (R939)
[22] (Id.)
[23] (R1007)

Plaintiff was found to be alert, cooperative, organized in his thought processes, and oriented.[24] His attention and memory were both intact.[25] After evaluation, Plaintiff was considered low risk for suicide and it was noted that he could be seen on an outpatient basis.[26] Plaintiff returned to the VA Hospital for group therapy sessions and it was noted that he was compliant with all group activities.[27] Towards the end of December 2009 through the year 2010, it was reported that Plaintiff began missing his group therapy sessions.[28]

On August 5, 2011, Plaintiff presented to the VA Hospital in Wisconsin due to an outburst with his girlfriend the previous night which resulted in physical abuse.[29] He stated that his girlfriend suggested that he seek treatment for his mental condition.[30] When asked about the altercation, it was noted that Plaintiff could not recall the incident and stated he did not know the trigger.[31] After evaluation, the attending physician categorized his depression as being a 19, which, according to the hospital scale, "warrants treatment for depression using antidepressant, psychotherapy, and or a combination of treatments."[32]

On November 11, 2011, Plaintiff presented to Kishwaukee Community Hospital ("Kishwaukee") for treatment of his chronic back pain.[33] After a physical evaluation, he was discharged home on the same day after normal findings.[34]

On April 30, 2012, Plaintiff was once again admitted to Sherman Hospital due to a headache arising from an accident in which a machine struck him on his head.[35] A CT scan was

---

[24] (R1052-53)
[25] (Id.)
[26] (R1038)
[27] (R978)
[28] (R1103-07)
[29] (R1258)
[30] (Id.)
[31] (Id.)
[32] (R1253)
[33] (R776)
[34] (R776-77)

4

performed and returned normal results.[36] While at the hospital, a MRI was taken of Plaintiff's neck and cervical spine, which also returned normal results.[37]

   B.   State Agency Physicians

On July 14, 2010, psychologist Dr. David Gilliland partially completed a Psychiatric Review Technique Form ("PRTF") but was unable to further assess Plaintiff's functioning due to a lack of medical information describing the severity of his impairments.[38] Dr. Gilliland noted that a consultative examination was established but Plaintiff failed to attend and was unresponsive to letters from the agency regarding rescheduling the appointment.[39]

On October 26, 2010, Dr. Laron Phillips of the Bureau of Disability Determination Services ("DDS") completed a psychiatric evaluation of Plaintiff.[40] Dr. Phillips diagnosed Plaintiff with PTSD, depressive disorder, and marijuana abuse.[41] Dr. Phillips noted that Plaintiff's symptoms originated in childhood but they have been severely exacerbated by his combat experience in Iraq.[42]

On November 22, 2010, psychologist Dr. Howard Tin completed a PRTF form that assessed Plaintiff's mental impairments under listing 12.04 for affective disorders, 12.06 for anxiety-related disorders, and 12.09 for substance addiction disorders.[43] As far as functional limitations, Dr. Tin noted that Plaintiff was mildly limited in activities of daily living but moderately limited in maintaining social functioning and maintaining concentration, persistence,

---

[35] (R1308)
[36] (R1311)
[37] (R1315)
[38] (R642-55)
[39] (R654)
[40] (R726-29)
[41] (R729)
[42] (Id.)
[43] (R734-47)

and pace.[44] He further noted that Plaintiff suffered one or two episodes of decompensation.[45] On the same day, Dr. Tin also completed a mental RFC assessment of Plaintiff.[46] In the areas of understanding and memory, Dr. Tin opined that Plaintiff was fully oriented, free of thought disorder or any serious memory problems.[47] He also noted that Plaintiff had the ability to remember locations or work-like procedures, as well as understand and remember short, simple instructions despite having difficulties remembering detailed instructions.[48] In the areas of sustained concentration and persistence, Dr. Tin noted that Plaintiff has a short attention span for about 15 minutes and cannot complete tasks.[49] During the examination, Dr. Tin found Plaintiff to be nervous and anxious.[50] Dr. Tin further opined that Plaintiff has difficulty interacting appropriately with the general public and harbors feelings of anger and irritability.[51]

### III. Hearing Testimony

Plaintiff appeared at the second hearing on October 17, 2013 and offered testimony. Plaintiff testified that after serving a tour in Iraq, he attended the Veteran Affairs ("VA") Hospital at Hines for psychological treatment because his family "did not feel comfortable" with him.[52] He testified that he attended the counseling and group counseling almost every day.[53] Plaintiff then testified that he has made sporadic visits to the VA Hospital in 2012 and 2013, but that generally he has difficulties remembering that he has a doctor's appointment and will often forget to go.[54] He also stated that because he is unable to drive, he has to take public

---

[44] (R744)
[45] (Id.)
[46] (R730-33)
[47] (R732)
[48] (Id.)
[49] (Id.)
[50] (Id.)
[51] (Id.)
[52] (R50)
[53] (R51)
[54] (R55)

6

transportation to go to his appointments and he does not have the funds to make the trip regularly.[55]

Plaintiff also testified that he is currently living in an apartment with his girlfriend who is pregnant.[56] His girlfriend performs the household chores and cooks.[57] At the time of the hearing, Plaintiff testified that he was working for a neighbor who owns a business delivering building materials to home stores.[58] Plaintiff stated that he made $8.25 an hour working for his neighbor for four days of the week for a couple of hours each day.[59] Plaintiff testified that he has limited communication with customers due to recent issues in which he would "blow up" at customers and get angry.[60] He further testified that certain triggers will make him irritable and angry in public.[61] He does not have any friends and finds it difficult to keep in touch with his family.[62]

Plaintiff further testified that while he was prescribed medication at the VA Hospital, he has been off his medication for some time.[63] He stated that the medication helps him sleep at night but it makes him moody and suicidal.[64] Plaintiff testified that he resorted to using marijuana to cope with his symptoms.[65] However, he stated at the hearing that he is trying to quit.[66] When he is not working with his neighbor, Plaintiff testified that he stays in bed and "listen[s] to the sound of the refrigerator turn on and off throughout the day and contemplate on problems and issues [he] has got going on."[67] Plaintiff testified further that he has trouble sleeping at night due to nightmares and that he wakes up exhausted, paranoid, anxious,

---

[55] (R92, 946)
[56] (R81)
[57] (R86)
[58] (R83)
[59] (R84)
[60] (R85-86)
[61] (R95)
[62] (R87)
[63] (R87)
[64] (R87-88)
[65] (R88)
[66] (R89)
[67] (R91)

7

depressed, upset, and irritable.[68] He further testified that on those days, he will lose his appetite due to the stress.[69] Plaintiff also experiences flashbacks on a daily basis for about 15 minutes to an hour.[70] He testified that certain smells and sights will trigger these flashbacks.[71]

## V. ALJ Decision

On December 6, 2013, the ALJ issued a written decision denying Plaintiff's DIB and SSI applications.[72] As an initial matter, the ALJ determined that Plaintiff met the insured status requirements of the Act through March 31, 2015.[73] At step one, the ALJ determined that Plaintiff has not engaged in SGA since January 1, 2009, the alleged onset date.[74] At step two, the ALJ determined that Plaintiff had depression, PTSD, anxiety, and cannabis abuse as severe impairments.[75] At step three, the ALJ found that Plaintiff did not have an impairment or a combination of impairments that meet or medically equal the severity of one of the impairments listed in 20 C.F.R. Part 404, Subpart P, App'x 1.[76] Before step four, the ALJ determined that Plaintiff had the Residual Functional Capacity ("RFC") to perform a full range of work at all exertional levels in a moderate noise work setting, but is limited to simple, routine, and repetitive work tasks, only average-paced work, incidental contact with coworkers and supervisors, and no contact with the public.[77] The ALJ found that the overall medical opinion evidence of record and Plaintiff's considerable work activity after his alleged onset date did not support the alleged intensity and limiting effect of his impairments and symptoms.[78] The ALJ also found that

---

[68] (R92)
[69] (Id.)
[70] (R93)
[71] (R93)
[72] (R11-27)
[73] (R16)
[74] (Id.)
[75] (R17)
[76] (R18)
[77] (R19)
[78] (R20)

Plaintiff's mental health treatments were sporadic.[79] Coupled with inconsistent statements Plaintiff made during the hearing, the ALJ determined that Plaintiff's allegations regarding his impairments are unsupported by the record.[80] At step four, the ALJ determined that Plaintiff is unable to perform his past relevant work as an auto-mechanic.[81] However, she determined that Plaintiff could perform a number of jobs existing in significant numbers in the national economy, such as mail clerk, office helper, and hand packer.[82] The ALJ concluded that Plaintiff's disability ended as of May 1, 2012 and he has not become disabled again after that date.[83]

## STANDARD OF REVIEW

Judicial review of the ALJ's decision is limited to determining whether the decision is supported by substantial evidence in the record and whether the ALJ applied the correct legal standards in reaching her decision.[84] Substantial evidence is evidence "a reasonable mind might accept as adequate to support a conclusion."[85] A "mere scintilla" of evidence is not enough.[86] Even when there is adequate evidence in the record to support the decision, however, the findings will not be upheld if the ALJ does not "build an accurate and logical bridge from the evidence to the conclusion."[87] If the Commissioner's decision lacks evidentiary support or adequate discussion of the issues, it cannot stand.[88] An ALJ "must minimally articulate her reasons for crediting or discrediting evidence of disability."[89] The court conducts a "critical review of the evidence" and will not uphold the ALJ's decision when "it lacks evidentiary

---

[79] (R23)
[80] (R24)
[81] (R25)
[82] (R26)
[83] (Id.)
[84] *Nelms v. Astrue*, 553 F.3d 1093, 1097 (7th Cir. 2009)
[85] *Richardson v. Perales*, 402 U.S. 389, 401 (1971)
[86] *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002)
[87] *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008)
[88] *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009)
[89] *Clifford v. Apfel,* 227 F.3d 863, 869 (7th Cir. 2000)

support or an adequate discussion of the issues."[90] However the court may not "displace the ALJ's judgment by reconsidering facts or evidence or make independent determinations."[91]

## ANALYSIS

A.  Social Function Limitations

First, Plaintiff argues that there is sufficient medical evidence of record to support a finding that he has marked limitations in social functioning but that the ALJ erred in finding only moderate limitations in this area. The regulations explain a "marked" limitation in the following way: "marked" is not the number of areas in which social functioning is impaired, but the overall degree of interference in a particular area or combination of areas of functioning. "For example, if you are highly antagonistic, uncooperative, or hostile but are tolerated by local storekeepers, we may nevertheless find that you have a marked limitation in social functioning because that behavior is not acceptable in other social contexts."[92] But Plaintiff's behavior, as described in the reports, may well evidence "marked" social limitations as defined in the regulations. Plaintiff was admitted to Sherman Hospital on December 1, 2009 after threatening to drown himself in the toilet while in police custody.[93] Medical reports indicate that he began punching walls and crying while in custody.[94] Medical records from the VA Hospital at Hines also document Plaintiff's outburst, sometimes involving physical violence towards his girlfriend, which he admitted during his admission were getting worse.[95] Moreover, during the hearing, Plaintiff described numerous instances of behavioral outbursts, such as "blowing up" on customers who are asking him questions and how a glance from strangers will trigger his anxiety and "change

---

[90] *Lopez ex rel. Lopez v. Barnhart,* 336 F.3d 535, 539 (7th Cir. 2003) *quoting Clifford,* 227 F.3d at 869
[91] *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008)
[92] 20 C.F.R. Part 404, Subpart P, Appendix 1, 12.00(C)(2)
[93] (R1144-45)
[94] (R1145)
[95] (R1258)

10

his whole mood."[96] The behavior just described certainly might be considered unacceptable in many social contexts.

However, the ALJ did not address this particular evidence in his analysis. While she acknowledged Plaintiff's suicide attempt while in police custody, she failed to provide any substantive analysis of this event and simply determined that the "overall treatment records do not corroborate the alleged severity of the claimant's symptoms and show only sporadic and inconsistent mental health treatment."[97] The ALJ failed to address that Plaintiff's behavior that is likely detrimental to his ability to maintain a full-time job.[98] This behavior should be considered, and the ALJ should clearly indicate consideration of it in her analysis.

The Commissioner argues that it was proper for the ALJ to rely on the opinions of the medical experts so long as they are not contradicted by the medical records.[99] While true, the issue is not that the ALJ relied on the medical opinions of the state agency consultant or the ME, but that the ALJ failed to fully explain her finding that Plaintiff has moderate limitations in social functioning. Though she adopted the medical opinion of Dr. Tin, she did not address the other evidence of Plaintiff's behavior that seem to support a more than moderate limitation. The ALJ may have had a sound basis for rejecting the evidence bolstering Plaintiff's claim of anti-social behavior and anxiety, but the ALJ's opinion reveals no such basis. The court is thus unable to adequately review the ALJ's decision without a clear articulation of the reason she rejected certain evidence of record.[100]

B.  Opinion Evidence

---

[96] (R85, 95-96)
[97] (R21)
[98] *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 391-92 (7th Cir. 1992)
[99] (Def. Mot. at 4)
[100] *Zblewski v. Schweiker*, 732 F.2d 75, 78–79 (7th Cir. 1984)

11

Next, Plaintiff argues that the ALJ erred in assigning weight to the opinion evidence on record. Pursuant to SSA regulations, the "ALJs are not bound by any findings made by State agency medical or psychological consultants, or other program physicians or psychologists."[101] Furthermore, "when an ALJ considers findings of a State agency medical or psychological consultant, the ALJ will evaluate the findings using the relevant factors, such as the consultant's medical specialty and expertise agency rules, the supporting evidence in the case record, supporting explanations the medical or psychological consultant provides, and any other factors relevant to the weighing of the opinions."[102] Here, the ALJ gave several reasons for why she did not give any weight to the medical opinion of State agency consultant Dr. Phillips. However, the reasons given were insufficient to completely deny weight to Dr. Phillips's medical opinion.

First, the ALJ found Dr. Phillips's medical opinion to be internally inconsistent. The ALJ specifically referenced Dr. Phillips's mental status examination which she considered to return almost "completely normal" results. However, Dr. Phillips diagnosed Plaintiff with PTSD, depressive disorder, and opined that his symptoms resulted in "severe impairment in social, occupational, and interpersonal functioning."[103] The "normal" results that the ALJ thought to undermine Dr. Phillips's medical opinion included Plaintiff being neatly dressed during the examination, Plaintiff having the ability to outline his history well, remaining cooperative, having normal body activity, and holding adequate conversation.[104] But the ALJ failed to explain how these findings actually contradicted Dr. Phillips's diagnosis of PTSD, depression, and severe limitations in social functioning. A person who has a chronic disease, whether physical or

---

[101] 20 C.F.R. § 404.1527
[102] (Id.)
[103] (R22)
[104] (R22)

12

psychiatric, and is under continuous treatment for it with heavy drugs, is likely to have better days and worse days; that is true of Plaintiff in this case.[105]

The ALJ also denied weight to Dr. Phillips's medical opinion because of his "vague" findings.[106] Specifically, the ALJ found Dr. Phillips's determination that Plaintiff has a "severe impairment in social, occupation, and interpersonal functioning" troubling because the word "severe" according to the ALJ, is not defined, open to interpretation, and lacking in insight as to Plaintiff's specific work-related functional limitations.[107] However, a severe impairment has been defined by the agency's regulation to mean an impairment or combination of impairments that "significantly limits [one's] physical or mental ability to do basic work activities."[108] There was no reason for the ALJ to question the meaning when it has been clearly defined by the SSA.

    C.    <u>Compliance with Treatment</u>

Plaintiff next contends that the ALJ erred in failing to consider the reasons for which Plaintiff did not comply with his psychiatric treatment. "Although a history of sporadic treatment or the failure to follow a treatment plan can undermine a claimant's credibility, an ALJ must first explore the claimant's reasons for the lack of medical care before drawing a negative inference."[109] An ALJ may need to "question the individual at the administrative proceeding in order to determine whether there are good reasons the individual does not seek medical treatment or does not pursue treatment in a consistent manner."[110] The claimant's "good reasons" may include an inability to afford treatment, ineffectiveness of further treatment, or intolerable side effects.[111]

---

[105] *Bauer v. Astrue*, 532 F.3d 606, 609 (7th Cir. 2008)
[106] (R22)
[107] (Id.)
[108] 20 C.F.R. §§ 404.1520(c); cf. 404.1521(a); *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010)
[109] *See Moss v. Astrue*, 555 F.3d 556, 562 (7th Cir. 2009); *Craft v. Astrue*, 539 F.3d 668, 679 (7th Cir. 2008)
[110] (Id.)
[111] *Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012)

In her written opinion, the ALJ found, on several occasions, that Plaintiff's sporadic treatment did not support the alleged intensity and limiting effect of his impairments and symptoms.[112] Although the medical evidence does indicate a sporadic treatment history, Plaintiff had "good reasons" for failure to comply with treatment. A reasonable reading of the medical evidence shows that Plaintiff had clear financial difficulties and was struggling with homelessness.[113] Much of his progress notes from the VA Hospital at Hines document his struggle to find housing and he often visited the hospital to seek help obtaining vouchers to obtain food.[114] Plaintiff testified at the hearing that his financial difficulty also prevented him from making his medical appointments and he often sought transportation assistance from family and from the VA Hospital so that he could go to the hospital for his appointments.[115] Despite clear indication that Plaintiff had the good reasons to explain his sporadic treatment, the ALJ failed to give them any consideration.

Additionally, it is not unusual for an individual with mental impairments to fail to comply with treatment. As the Seventh Circuit previously explained, a person who suffers from a mental illness will have better days and worse days, so a snapshot of any single moment says little about his overall condition.[116] Here the ALJ found Plaintiff's allegations incredible because she found him to have significant improvement when compliant with his medication.[117] However, Plaintiff testified at the hearing that he had difficulty "remembering things and getting things done and following up on things."[118] Yet the ALJ never acknowledged Plaintiff's alleged difficulty in

---

[112] (R20-21)
[113] (R719, 875, 933, 939)
[114] (R708, 922)
[115] (R92, 922, 933, 946)
[116] *See Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010); *Kangail*, 454 F.3d 627 at 629; *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011); *Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011)
[117] (R21)
[118] (R55, 87)

making his appointments and seems to have simply cherry-picked the evidence that supported her determination of non-disability.[119]

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment is granted and the Commissioner's cross-motion for summary judgment is denied. This matter is remanded for further proceedings consistent with this opinion.

**ENTERED**

**DATE:** 7/13/2016

_____

**Susan E. Cox, U.S. Magistrate Judge**

---

[119] *Yurt v. Colvin*, 758 F.3d 850, 859 (7th Cir. 2014) *citing Bates v. Colvin*, 736 F.3d 1093, 1099 (7th Cir. 2013) ("An ALJ cannot rely only on the evidence that supports her opinion.")